*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

RICKEY DALE RICHETT,

Defendant-Appellant.

UNPUBLISHED
March 06, 2026
10:33 AM

No. 365659
Wayne Circuit Court
LC No. 19-001001-01-FC

Before: WALLACE, P.J., and GARRETT and ACKERMAN, JJ.

PER CURIAM.

Defendant, Rickey Dale Richett, and his codefendant, Damian Willingham, were involved in a physical altercation with two other individuals, Michael Beaudrie and Thomas Beaudrie, outside a bar. Michael died as a result of the altercation. Richett appeals by right his jury-trial convictions of second-degree murder, MCL 750.317, with respect to Michael and assault with intent to do great bodily harm less than murder (AWIGBH), MCL 750.84, with respect to Thomas. The trial court sentenced Richett to 30 to 50 years' imprisonment for the murder conviction and 2 years and 6 months to 10 years' imprisonment for the AWIGBH conviction. For the reasons set forth in this opinion, we affirm.

## I. FACTUAL BACKGROUND

### A. TRIAL

On May 5, 2018, Richett went to Champions Sports Grill (Champions) in Brownstown Township with his wife, daughter, stepdaughter, and their friends, including Willingham. At the bar, Thomas harassed some of the younger women in Richett's group. Thomas was at the bar with his brother, Michael, and Tracy Bonar. While no altercations occurred inside the bar, Bonar heard people behind her "sayin' stuff" as she left the bar at closing time with Thomas and Michael. The same people followed Bonar, Thomas, and Michael into the parking lot. Michael told the men following them that Michael's group did not want any trouble. Thomas also stopped and said something to the men, but Bonar did not hear what Thomas said. After that, Bonar was not sure where Thomas went.

-1-

Bonar and Michael continued walking until Michael stopped and turned around to see what was going on with Thomas; Bonar then saw "fists go up" and Michael fall. Bonar saw someone's fist strike the side of Michael's head, which caused him to fall backward. His head struck the ground, and he did not move again afterward. Bonar did not see anyone kick Michael and did not see Michael throw a punch at anyone. Although Bonar was not sure where Thomas went, she saw another fight occurring and called 911. When Bonar later saw Thomas, his face was bloody, and he was not in "good shape."

Guyontai Gray-Rice was also at Champions that night. He observed a bald man, i.e., Richett, with a woman who appeared to be a bodybuilder, i.e., Richett's wife, Loretta Lopez. After Gray-Rice walked outside at closing time, he observed a drunk man, later identified as Thomas, accidentally bump into another man, i.e., Willingham. Willingham became upset and charged after Thomas. Gray-Rice thought Willingham said something to Thomas, indicating that Willingham was going to "f**k him up." Willingham "got in" Thomas's face, but a woman tried to get between them to calm Willingham down and pull him away. Instead, Willingham threw a punch at Thomas. An older, large, tall man, acknowledged to be Michael, attempted to break up the fight, but Richett hit Michael in the face, and Michael fell to the ground. Gray-Rice did not see Michael throw a punch, but Michael and Richett talked before Richett punched Michael. It appeared to Gray-Rice that Michael was trying to convince Thomas to leave, and Michael was not acting aggressively.

Thomas and Willingham continued fighting. Gray-Rice believed Willingham was the initial aggressor and that Thomas was not acting aggressively. Richett then struck Thomas, and, as Willingham and Thomas fought on the ground, Richett continued to assault Thomas while Thomas attempted to defend himself. Richett went back to Michael, and it appeared to Gray-Rice that Richett began to kick Michael. Although Gray-Rice did not see Richett kicking Michael, Gray-Rice could see Richett's upper body thrust forward as if he was kicking Michael. Gray-Rice saw the women in Richett's group try to pull him away from Michael. The fight ended when the women were able to pull both Willingham and Richett away, and they all left in their vehicles. Gray-Rice did not see Michael move afterward.

Joshua Clawson saw a commotion in the parking lot as he was leaving Champions. He recognized Willingham as a former high school classmate and saw that Willingham was involved in a fight. At the time Clawson saw Willingham, Michael was already on the ground and not moving. Clawson saw Willingham fighting with Thomas, who was defending himself. Richett then joined Willingham and both men punched Thomas, who continued trying to defend himself. Thomas fell to the ground near Michael, and both Richett and Willingham punched and kicked Thomas while he was in a fetal position on the ground.

Several witnesses saw Richett and Willingham leave to the parking lot in a van. Before they did so, Brandon Garza, the assistant manager of the bar, went outside and saw a fight in the back of the parking lot. He saw two or three men get into a van and someone try to grab one of the men out from the passenger side of the van. Two men jumped out of the van and chased the other man away before they jumped back into the van and left the parking lot.

Thomas admitted that he drank alcohol and used cocaine on the day of the incident. At approximately 2:00 p.m. that day, Thomas posted a Facebook message that stated "I'm in a devilish

mood, ha. Look out tonight, mofos." Thomas did not recall posting the message and had no recollection of any of the events that occurred that night. His only memory related to that night involved trying to get to a hospital the next day to see Michael, who was unresponsive. Michael never regained consciousness and died on May 7, 2018. He suffered injuries to his head and abdomen, caused by blunt-force trauma. His head injury was possibly caused from striking his head on the ground. Michael had both alcohol and cocaine in his system at the time he died. Thomas himself received nonlife-threatening injuries because of the incident and sought medical treatment several days later.

The prosecution charged Richett with open murder, MCL 750.316, with respect to Michael, and assault with intent to commit murder, MCL 750.83, regarding Thomas. The prosecution later amended the information to charge Richett with second-degree murder rather than open murder with respect to Michael. Richett was tried together with Willingham before the same jury. Similar to Richett, the prosecution charged Willingham with second-degree murder and assault with intent to murder, but the jury convicted Willingham of only AWIGBH.

During most of the trial court proceedings, attorney Vassal Johnson represented Richett. Approximately one week before trial, Richett retained new counsel, Craig Tank, and Tank appeared ready to represent Richett at the start of trial. Johnson moved to withdraw based on a breakdown in his relationship with Richett, but the trial court denied the motion and indicated that both attorneys would represent Richett as cocounsel, but only one attorney could address the court at a time. Johnson conducted voir dire while Tank handled the remainder of trial. Richett's defense was that he acted in self-defense and defense of others, and he requested jury instructions on both defenses. The trial court addressed self-defense only and denied the request on the basis that the evidence did not support it. Over Richett's objection, the court instructed the jury on AWIGBH as a lesser-included offense of assault with intent to commit murder. The jury convicted Richett of second-degree murder and AWIGBH, and the trial court sentenced him as previously stated. The court also imposed restitution, requiring Richett to pay Michael's funeral expenses.

B. MOTION FOR A NEW TRIAL

After trial, Richett moved for a new trial and an evidentiary hearing, based on ineffective assistance of counsel, in accordance with *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973). He argued that Tank was ineffective for failing to call witnesses to support his defense that he acted in defense of others because Thomas harassed his daughter, stepdaughter, and their friends on the night of the incident. He also argued that Tank was ineffective for failing to request an instruction on voluntary manslaughter as a lesser-included offense of second-degree murder. The trial court granted Richett's request for a *Ginther* hearing.

Lopez was married to Richett when the incident occurred, but they were divorced at the time of the evidentiary hearing. Idalia Vales, Lopez's daughter, was at Champions with Richett, Lopez, and Vales's friends to celebrate the birthdays of both Vales and Lopez. Richett was the group's designated driver. Thomas started "hitting on" her not long after she arrived, but she ignored him because he was old enough to be her father, and he appeared to be under the influence of something. She also felt it was "kind of weird" that he approached her. Thomas approached her and her best friend, Katie Ray, throughout the night, but she never told the bar's employees that Thomas was bothering her. Vales did not interact with Michael.

As the group was leaving, Vales saw an altercation between Willingham and Thomas, but Lopez pushed her into their van to get her away from the chaos. Vales never saw Michael or Richett after leaving the bar. Once she was inside the vehicle, she did not see what was happening in the parking lot, but she heard a lot of commotion and yelling. She initially denied talking to the police or to Johnson, but she maintained that she talked to Tank, although he did not prepare her to testify at trial. Vales later clarified that she talked to Johnson early in the proceedings when they were at a court hearing and may have talked to him on the phone as well. Johnson told her not to speak to the police.

Vales did not know what happened between Willingham and Thomas, but Willingham stated afterward in the van that Thomas had offered to "buy" the women for the night, and Willingham "got pissed" and started the fight. Vales learned that Richett had been involved in the altercation on the ride home. Vales spoke to Tank after trial began. Although Thomas never touched or harmed her, she told Tank that the women's side of the story was not being represented. Sometime after they left the bar, Richett stated that he punched Michael only one time and that he did so because he was defending himself.

Ray testified that she drank a lot on the night of the incident and that the group had gone to other bars before they went to Champions. She recalled an older man, i.e., Thomas, trying to talk to and dance with their group at Champions. Ray asked the man to leave them alone and could not understand his response because it was "gibberish." The man made her uncomfortable, but he did not threaten, touch, or assault her, and she did not tell the bar staff that he was bothering her.

Ray did not see Thomas as she and the other women left the bar. After she got into the van, she recalled Lopez telling her to stay in the van. Ray assumed that something was going on, and she heard people talking and loud noises, but she could not see what was happening outside the van. Although Ray knew that Vales and Ryleigh Richett, Richett's daughter, were upset, she did not know why they were upset. She did not recall if Willingham was in the van after the group left the bar and did not remember someone being pulled out of the van. When the police interviewed her, she told them she had a problem with Thomas at the bar, as she testified. She did not talk to any of Richett's attorneys, and nobody from Richett's family asked her to be a witness, although she talked to Vales "all the time."

Richett's daughter, Ryleigh, also had a lot to drink on the night of the incident. She recalled a man talking to Vales at the bar, but she did not know what he said. Ryleigh identified the man as Thomas. He followed the women to the dance floor and around it. She described Thomas as "creepy" with a "weird vibe," which made her uncomfortable. He hovered around them wherever they went in the bar. She did not say anything to Richett about Thomas, but she thought Richett noticed what Thomas was doing.

When Ryleigh left the bar with the other women, she did not see Thomas. She went directly to the van and got inside, but there was no one else in it. At that point, Ryleigh saw a man on the ground who looked like he was sleeping or passed-out drunk. She did not see any commotion, but when she approached the man, who she later learned was Michael, Lopez grabbed her and told her to get into the van. Ryleigh did not realize everything that was going on until someone said there was a fight. She learned the next day that Richett had been involved in the fight and discussed it with him. She denied that Richett was violent or had been involved in a fight previously and had

not witnessed him fly into a sudden rage. She believed that Richett had been protecting them. She did not know Richett to use steroids, and he was not involved in bodybuilding, but he had helped Lopez prepare for her bodybuilding competitions. Ryleigh approached Johnson after a hearing and asked him some questions, but Johnson never asked Ryleigh her version of the events. On the first day of trial, Ryleigh was told to stay out of the courtroom because she might be testifying, but Tank never talked to her about testifying.

McKayla Vanstone was McKayla Lowry at the time of the incident. She was one of Vales's friends and Willingham's fiancée, but she and Willingham were no longer together, and she was recently married. She drove herself and Willingham separately to Champions. Inside the bar, Thomas approached her and asked if he could buy the women drinks, but she declined the offer, and he then approached another one of the young women. Vanstone asked Lopez to tell Thomas to leave them alone. Vanstone believed Thomas was drunk because he was slurring his words and he spit when he talked. Lopez stepped in between Vanstone and Thomas and asked him to please leave them alone. Thomas then walked away.

Vanstone walked out of the bar right behind the other women. Thomas was standing just outside the doors. Vanstone locked arms with the other women and got them into their van. She saw Richett, Willingham, and Lopez standing near the entrance with Thomas. Vanstone turned around and snapped her fingers or clapped to get the attention of Richett, Willingham, and Lopez, so they could all leave. A couple of seconds later, the three of them walked over and they all got into their vehicles. Vanstone and Willingham were in their car, with the windows down, when Thomas approached the passenger side. Thomas reached his hand into the car and grabbed Willingham by his shirt. Willingham got out of the car and went behind the vehicle. Vanstone could not see what occurred behind the vehicle, but she guessed that the fight started at that point. Vanstone got out of her car when she saw that the door of the van open. She tried to keep the women inside the van away from the altercation. After Willingham got into the van, both vehicles left the parking lot. The next day, when the police arrived at their home, Vanstone did not talk to the officers because Willingham told her "to keep [her] mouth shut." She did not know Richett to fly into rages or take steroids, and Richett's lawyers never talked to her.

Lopez was involved in competitive bodybuilding and was seeking to obtain professional status as a bodybuilder, so she was not drinking very much on the night of this incident, although she had three to four drinks. She confirmed that she intervened to tell Thomas to leave the younger women alone after some of them complained that he was bothering them and "creeping them out." Thomas looked lost and "kind of out of it," possibly because he was intoxicated. He was wandering around the bar, and Lopez did not see Michael inside the bar. When Richett asked her what was going on after she confronted Thomas, she responded that she told Thomas "to leave the girls alone . . . and that everything's fine."

Lopez saw Thomas near the door as she left the bar with Richett and Willingham. Lopez said, "You again?" Thomas responded, "No, no, no, I just wanted to buy your girls." Willingham then said something to Thomas that Lopez could not recall. Thomas's remark made Lopez uncomfortable, and she felt that she needed to keep an eye on the younger women. Near the vehicles, Lopez saw Willingham and Thomas fighting while the women tried to stop them. Lopez tried to get the women inside the van and keep them from getting involved in the fight. Richett was seated in the driver's seat of the van, but they could not leave because a car was in the way.

Lopez was in and out of the van, trying to keep the younger women inside it. When she went to grab one of the women, she saw a large man, later identified as Michael, standing nearby with "his fists ready." She thought he was going to hit her, but she then saw him on the ground. She did not see what happened to Michael, but she noticed Richett getting back into the van at that time. She saw Richett get back out of the van when Willingham continued to fight with Thomas behind the van. Lopez believed Richett was trying to stop the fight. Once the vehicle that was blocking their van moved, Lopez told Willingham that they should go, and they left. Lopez, however, returned with Vanstone in Vanstone's car to get her purse. When she returned, Thomas pointed her out to the police, and she spoke with officers, telling them "Thomas was bothering my girls all night." When the police asked her if she had seen a silver van, she said she did not because their van was white. She also did not tell the officers that Richett and Willingham had been involved in the fight. She admitted she had a criminal record and did not trust the police. She also wanted to gather her thoughts together to figure out what happened before making a statement. Lopez did not speak to the police again because Johnson advised her not to make any statements.

Lopez communicated with Johnson a couple times a month and met with him at court appearances. She denied that Johnson ever discussed needing money to hire an expert witness, although he might have mentioned requiring the assistance of a specialist. Lopez would have asked Richett's family for money if it was necessary to hire an expert. Lopez talked to Johnson about whether she should testify and told him everything that occurred, including that she thought that Michael was going to hit her. Johnson did not want her to testify because it looked as if she lied to the police when she returned to get her purse, and it would not be a good idea for her to testify when it would compromise Richett's case. Lopez admitted that she lied to the police, and she told Tank that she had lied. Lopez met with Tank at Champions and drove her van there so Tank could see how the incident unfolded. Tank also wanted to check if there were cameras at the bar. Lopez told Tank that she believed that Michael was going to hit her and that Richett was protecting her and the young women from Thomas. Tank initially told her that he wanted her to testify at trial but later told her that he did not need her to testify "because he had had everything taken care of," and the defense's theory was self-defense. Lopez denied telling Tank that she thought Richett had developed a temper as a result of using steroids, and neither she nor Richett used steroids. She maintained that Richett was not violent, and she had never seen him involved in another fight.

In preparing for trial, Johnson talked to experts, including Dr. Werner Spitz, who could have testified about Michael's cause of death, but Dr. Spitz was not called because the fee was about $9,000, and Richett and Lopez decided that "they weren't going that route[.]" Johnson believed that an expert's testimony would have been helpful, and it would not have precluded Richett from also arguing self-defense or defense of others. Johnson did not initially consider asking the trial court to appoint an expert because "that wasn't available until months later."

Johnson investigated Richett's theories of self-defense and defense of others. He talked to Lopez and some of the younger women, but did not think they provided any information that would have supported a defense-of-others theory. At most, the younger women described Thomas hitting on them while they were in the bar. In fact, one of the younger women, or possibly Lopez, described trying to pull Richett into the van so they could leave, but Richett wanted to stay and fight. In addition, discovery showed that Richett kicked and stomped Michael when Richett maintained he only punched Michael. Johnson did not recall Richett stating that he wanted to

-6-

testify and believed it was likely he did not want to testify or have his family members testify. Johnson moved to withdraw on the first day of trial because, during a meeting with Richett the previous week, Richett threw his glasses down, yelled at Johnson, and called him a "punk ass bitch." Johnson also believed that Richett did not require his services because he had hired another lawyer. When the trial court denied his motion to withdraw, Johnson and Tank briefly discussed dividing up the duties at trial. Johnson handled voir dire and acted as Tank's assistant. Johnson left any decisions related to the handling of the trial, including whether to call any witnesses, to Tank.

Richett hired Tank about a week before trial started. Tank talked to Richett, at length, on several occasions before Richett retained him and thought that he talked to Johnson as well. Tank believed Richett hired him as Johnson's cocounsel, not to replace Johnson, although he was prepared to try the case alone. Tank obtained the discovery, transcripts, and other records in this case about a week before trial began. He intended to argue self-defense as the defense's theory, which went hand-in-hand with defense of others. Tank believed he could have sought a voluntary manslaughter instruction if Richett had testified, and he prepared Richett to testify, but Richett ultimately refused to do so toward the end of trial. Tank was not aware of an alternative way to prove self-defense, but he believed some facts still supported the theory, such as Michael's intoxication and an abrasion on one of his knuckles that could be considered an offensive wound. However, because Richett refused to testify, Tank did not believe the evidence supported any lesser-included offenses. He would have requested a lesser-included offense instruction if there was a legal basis to do so. Moreover, Richett believed that second-degree murder had not been proven, and there was a concern that he could have been convicted of a lesser offense if the jury was instructed on lesser offenses.

Tank interviewed Lopez and some of the younger women and met Lopez at Champions so she could explain what occurred in the parking lot and her interactions with both Thomas and Michael. Tank did not consider having any of the women with Richett on the night of the incident testify because, after interviewing them, he concluded they had not seen what happened in the parking lot. Tank understood that either Thomas or Michael offered to sell the younger women cocaine and was not aware that Thomas had asked to buy the younger women. Richett also never told Tank that the women were in any kind of physical danger while they were at the bar, although something inappropriate may have been said to them. Tank believed that he could have argued that Richett acted in defense of another by helping Willingham.

Tank further explained that he did not call additional witnesses because he believed they would have testified that Richett was very upset and had a "hair trigger" temper because of his use of several anabolic steroids, which made him very aggressive. Tank was advised that Richett had been injecting himself with steroids and "was in a roid rage." He believed that Lopez had disclosed Richett's steroid use, and Lopez was herself a bodybuilder. Tank did not want that testimony coming out on cross-examination, particularly when those witnesses did not see the actual altercation. In addition to the testimony produced in support of Richett's motion for a new trial, he also provided records indicating that Tank was disbarred, effective March 1, 2025, for professional misconduct involving multiple clients. The disciplinary action, however, was not related to Tank's representation of Richett.

The trial court denied Richett's motion for a new trial based on ineffective assistance of counsel. The court initially explained that it did not consider Tank's disbarment because that matter was not included as a basis supporting Richett's motion for a new trial, and trial occurred in 2019, well before the disciplinary proceeding against Tank. The court determined that Richett was not denied the effective assistance of counsel based on the failure to call witnesses because the testimony at the *Ginther* hearing showed that the people in Richett's group at the bar did not see Richett's altercations with Thomas and Michael and both Tank and Johnson had talked to those witnesses when preparing the case for trial. It was also agreed that the witnesses were not beneficial to the defense. In fact, there was concern that the witnesses, particularly Lopez, might reference Richett's steroid use, which could have triggered his temper. Lopez was also a problematic witness because she admitted lying to the police about the incident. Further, the court concluded that the evidence presented at the *Ginther* hearing did not indicate that defense counsel were ineffective for failing to request an instruction on voluntary manslaughter, and the record showed that both Tank and Johnson made reasonable strategic decisions during their representation of Richett. This appeal followed.

## II. COUNSEL'S ARGUMENTS

### A. INEFFECTIVE ASSISTANCE OF COUNSEL—FAILURE TO CALL WITNESSES

Richett argues that Tank rendered ineffective assistance of counsel by failing to present the testimony of the witnesses who were present at the time of the incident: Lopez, Vanstone, Vales, Ryleigh, and Ray. Because Richett raised this issue in his motion for a new trial, and the trial court addressed it, it is preserved for our review. *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012).

Whether a defendant has been denied the effective assistance of counsel is a mixed question of fact and constitutional law. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). We review the trial court's factual findings for clear error and review de novo questions of constitutional law. *Id*. To demonstrate ineffective assistance of counsel, the defendant must establish that counsel's performance was deficient, which involves "whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *People v Leffew*, 508 Mich 625, 637; 975 NW2d 896 (2022), quoting *Strickland v Washington*, 466 US 668, 690; 104 S Ct 2052; 80 L Ed 2d 674 (1984). The defendant must also demonstrate that he was prejudiced by counsel's error. *Leffew*, 508 Mich at 637. To establish prejudice, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*., quoting *Strickland*, 466 US at 694. A reasonable probability is " 'a probability sufficient to undermine confidence in the outcome.' " *Leffew*, 508 Mich at 637, quoting *Strickland*, 466 US at 694.

Effective assistance of counsel is presumed, and the defendant bears a heavy burden to prove otherwise. *People v Head*, 323 Mich App 526, 539; 917 NW2d 752 (2018). To prove that counsel's performance was deficient, the defendant must overcome a strong presumption that counsel's performance constituted sound trial strategy. *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001). Decisions regarding the evidence to present, whether to call witnesses, and how to question witnesses are presumed to be matters of trial strategy. *People v Horn*, 279 Mich

App 31, 39; 755 NW2d 212 (2008). This Court is reluctant to substitute its judgment for that of trial counsel with respect to matters of trial strategy. *People v Davis*, 250 Mich App 357, 368; 649 NW2d 94 (2002). We will determine that counsel is ineffective based on strategic decisions only if the strategy employed was not sound or reasonable. *People v Cline,* 276 Mich App 634, 637; 741 NW2d 563 (2007). The failure to advance a meritless argument or raise a futile objection does not amount to ineffective assistance of counsel, *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010), and the burden is on the defendant to produce factual support for an ineffective-assistance claim, *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999).

Further, while many of counsel's decisions are generally considered to be strategic, and are therefore given deference, counsel is required to conduct a complete investigation of matters that could reasonably impact the defendant's case. As explained in *People v Trakhtenberg*, 493 Mich 38, 52-53; 826 NW2d 136 (2012):

> In examining whether defense counsel's performance fell below an objective standard of reasonableness, a defendant must overcome the strong presumption that counsel's performance was born from a sound trial strategy. *Strickland*, 466 US at 689. Yet a court cannot insulate the review of counsel's performance by calling it trial strategy. Initially, a court must determine whether the "strategic choices were made after less than complete investigation," and any choice is "reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-691. Counsel always retains the "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* [Alteration omitted.]

Stated another way, counsel may not rely on trial strategy in response to a claim of ineffective assistance of counsel if the strategy used was chosen before conducting a reasonable investigation. *Trakhtenberg*, 493 Mich at 53 n 8.

Initially, we note that although Richett asserts that Tank's failure to call witnesses denied him a substantial defense, a defendant is not required to show that he was denied a substantial defense in order to establish an ineffective-assistance claim based on the failure to call witnesses. In *People v Jurewicz*, 506 Mich 914, 915 (2020), our Supreme Court explained:

> The Court of Appeals erred in holding that " 'the failure to call witnesses only constitutes ineffective assistance of counsel if it deprives the defendant of a substantial defense.' " *People v Jurewicz*, 329 Mich App 377, 382 (2019), quoting *People v Russell*, 297 Mich App 707, 716 (2012). The defendant was not required to show, in order to obtain relief for ineffective assistance of counsel, that trial counsel's failure to call witnesses deprived him of a substantial defense. Rather, a claim of ineffective assistance of counsel premised on the failure to call witnesses is analyzed under the same standard as all other claims of ineffective assistance of counsel, i.e., a defendant must show that "(1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *People v Trakhtenberg*, 493 Mich 38, 51 (2012); see also *Strickland v*

*Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984). [Alteration omitted.]

We also note that we find no error with respect to the trial court's refusal to consider Tank's disbarment in 2025. Richett has not shown how that disciplinary action was relevant to his trial in 2019, and Tank's representation of Richett was not a subject of the disciplinary proceeding. Accordingly, the trial court correctly determined that Tank's disbarment was not relevant to whether Tank rendered ineffective assistance of counsel during his representation of Richett.

Turning to the substance of Richett's argument, we conclude that the trial court properly determined that Richett was not denied the effective assistance of counsel based on Tank's failure to call Lopez, Vanstone, Vales, Ryleigh, and Ray to testify at trial. As the witnesses' *Ginther* hearing testimony demonstrated, the testimony would not have aided Richett's defense. None of the younger women could address how the initial fight broke out between Willingham and Thomas, and they did not see anything that could have assisted Richett's defense. It was apparent that they had been shielded from much of the fighting and only observed portions of the incident. Some of the younger women were not even aware until afterward that Richett had been involved in the fight.

To the extent that Richett claims the witnesses could have supported the theory that he intervened in the altercation and punched Michael because he was defending them, we agree with the trial court that the testimony was insufficient to support this theory. "Under the defense-of-others doctrine, one may use force in defense of another when he or she reasonably believes the other is in immediate danger of harm and force is necessary to prevent the harm; deadly force is permissible to repel an attack which reasonably appears deadly." *Leffew*, 508 Mich at 638 (quotation marks, citation, and alteration omitted). "As with self-defense, defense of others is generally not available to a person who is the initial aggressor." *Id*.

Even if the initial use of force could be considered nondeadly, the witnesses' testimony did not establish that any of the women were in immediate danger of harm when the assaults on Thomas and Michael occurred. While Thomas may have been harassing the women in the bar earlier during the night, there was no immediate threat to them after they left the bar to get into their vehicles. Further, Richett was not acting in defense of Willingham, who, by all accounts of the disinterested witnesses, was the initial aggressor. Because none of the proposed witnesses could have supported the theory that they faced immediate danger from Thomas or Michael, we cannot conclude that Tank's strategic decision not to call them to testify was unreasonable.

Further, while Lopez claimed that she could have testified that Michael was preparing to strike her before he was knocked unconscious, other testimony contradicted her claim. Moreover, she testified that she did not see who hit Michael, and, although she saw Richett get into the van after Michael was struck, Richett got back out again afterward while Willingham and Thomas were fighting. In addition, Lopez admitted lying to the police about the incident, and her testimony likely could have led to questioning about whether Richett used steroids and was in a "roid rage" at the time of the incident. Thus, Tank determined that her testimony likely would have hurt, rather than benefited, Richett's defense.

-10-

The *Ginther* hearing testimony showed that Tank investigated the testimony that the witnesses could offer and reasonably determined it would not benefit Richett. Accordingly, Richett has not overcome the presumption that Tank's decisions constituted sound trial strategy. *Carbin*, 463 Mich at 600. Likewise, he has not shown that the trial court clearly erred by determining that Tank's performance was not deficient. *Leffew*, 508 Mich at 637; *LeBlanc*, 465 Mich at 579.

## B. INEFFECTIVE ASSISTANCE OF COUNSEL—JURY INSTRUCTIONS

Next, Richett argues that Tank was ineffective for failing to request an instruction on voluntary manslaughter as a lesser-included offense of second-degree murder. We conclude that the trial court did not err by denying Richett's motion for a new trial on this ground.

"Manslaughter is murder without malice." *People v Mendoza*, 468 Mich 527, 534; 664 NW2d 685 (2003). "The elements of voluntary manslaughter are: (1) the defendant must kill in the heat of passion, (2) the passion must be caused by an adequate provocation, and (3) there cannot be a lapse of time during which a reasonable person could control his passions." *People v McMullan*, 284 Mich App 149, 156; 771 NW2d 810 (2009), aff'd with clarification 488 Mich 922 (2010) (quotation marks omitted). "The provocation must be sufficient to cause the defendant to act out of passion rather than reason, but it also must be sufficient to cause a reasonable person to lose control, not just the specific defendant." *People v Yeager*, 511 Mich 478, 489; 999 NW2d 490 (2023). In a case charging murder, manslaughter instructions must be given if supported by a rational view of the evidence because manslaughter is a necessarily included lesser offense of murder. *Mendoza*, 468 Mich at 541; see also M Crim JI 16.9.

The evidence presented at trial failed to support a voluntary manslaughter instruction because it did not establish adequate provocation. Even considering the *Ginther* hearing testimony, the evidence did not show that Richett killed Michael in the heat of passion, caused by adequate provocation. Although Richett maintains that he was in a "highly excited state" and acted in defense of others, the record does not show that anyone in his group was in danger. In addition, while Thomas may have made comments to the younger women and about the younger women, his comments would not have caused a reasonable person to act in the manner that Richett acted. Because the evidence in *Yeager* supported a voluntary manslaughter instruction, but the defendant's trial attorney failed to request one based on an error of law, Richett's reliance on *Yeager* is misplaced. A rational view of the evidence in this case did not support the instruction, and Tank testified as such.

In addition, the decision not to request any lesser-included instructions can be an effective trial strategy. *People v Dunigan*, 299 Mich App 579, 584; 831 NW2d 243 (2013). An "all or nothing" defense, in which the defendant foregoes instructions on any lesser offenses, is a legitimate trial strategy. *People v Nickson*, 120 Mich App 681, 687; 327 NW2d 333 (1982). Tank testified that Richett did not believe that second-degree murder had been established. Tank also testified that he discussed with Richett the risk that the jury could determine the evidence supported a lesser offense and convict him of that offense when he otherwise could be acquitted of all conduct involving Michael. Tank maintained that he, together with Richett, decided not to request a lesser-included offense instruction regarding second-degree murder. While that decision in hindsight may not have benefited Richett, it was nevertheless a reasonable strategic decision and one with

which Richett agreed. Richett has not shown that Tank was ineffective for failing to request the instruction, and the trial court did not err by denying his motion for a new trial on this ground.

## C. SENTENCING

Richett next argues that his minimum sentence of 30 years' imprisonment for second-degree murder is unreasonable and disproportionate. There is no preservation requirement when a defendant challenges the reasonableness of a sentence, but appellate courts must review all sentences for reasonableness. *People v Mason*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 367687); slip op at 2 (quotation marks and citation omitted). We review a trial court's sentencing decision for an abuse of discretion. *People v Steanhouse*, 500 Mich 453, 471; 902 NW2d 327 (2017). An unreasonable sentence amounts to an abuse of discretion. *Id*. A sentence is unreasonable if the trial court failed to follow the principle of proportionality or failed to provide adequate reasons for the extent of a departure from the sentencing guidelines. *Id*. at 476.

To determine a proportionate sentence, a trial court must consider the nature of the offense and the background of the offender. *Id*. at 472. The principle of proportionality primarily involves whether the sentence is proportionate to the seriousness of the matter, not whether it departs from or adheres to the guidelines. *Id*. This Court may consider the following, nonexhaustive list of factors when determining a sentence's proportionality:

> (1) the seriousness of the offense; (2) factors that were inadequately considered by the guidelines; and (3) factors not considered by the guidelines, such as the relationship between the victim and the aggressor, the defendant's misconduct while in custody, the defendant's expressions of remorse, and the defendant's potential for rehabilitation. [*People v Lampe*, 327 Mich App 104, 126; 933 NW2d 314 (2019) (quotation marks and citation omitted).]

The trial court imposed a 30-year (360-month) minimum sentence, which was within the sentencing guidelines range of 270 to 450 months, or life. There is no requirement that a sentencing court must expressly explain why a within-guidelines sentence is reasonable and proportionate. *People v Posey (On Remand)*, 349 Mich App 199, 207; 27 NW3d 137 (2023). Accordingly, Richett is not entitled to resentencing because the trial court did not give a more detailed explanation to support its sentence.

However, the court explained that it found Richett's actions particularly violent because Richett punched Michael and then proceeded to kick and stomp him when he was on the ground and incapable of defending himself. The facts also showed that Michael was attempting to act as a peacemaker in the altercation involving Thomas and Willingham when Richett assaulted him. Under the circumstances, the court found that a minimum sentence of 30 years was reasonable.

On appeal, Richett emphasizes that Michael likely sustained his fatal injuries when he was initially punched and then fell to the ground. He claims that because it was a single punch that caused Michael's death, the sentence imposed was not reasonable or proportionate. We cannot agree. The facts showed, as the trial court explained, that Richett engaged in an unwarranted, violent attack of Michael when Michael tried to break up the fight between Thomas and Willingham. The incident therefore involved a violent and unjustified attack of an innocent

-12-

person. At sentencing, Richett denied responsibility for assaulting either man and claimed that he was a victim of the legal system. Although there is no indication that Richett's remarks affected the trial court's sentence, they demonstrated his failure to appreciate the seriousness of his actions. Richett's 30-year minimum sentence is not disproportionate and reflects the seriousness of the matter.

Richett also points out that he had no prior felonies and was otherwise an upstanding member of the community who supported his family. Therefore, his history supported a sentence at the bottom of the guidelines. In contrast, at sentencing, the prosecutor emphasized that Richett had a history of substance abuse and assaultive crimes, including domestic violence, but his history had failed to teach him anything, and his nonfelony criminal history evidenced a pattern of substance abuse and assaultive behavior. Because Richett's criminal history demonstrates his unwillingness to obey the law, a greater punishment is reasonable. See *People v Purdle (On Remand)*, ___ Mich App ___; ___ NW3d ___ (2024) (Docket No. 353821); slip op at 6. We therefore find no error regarding the trial court's imposition of a sentence near the middle of the guidelines rather than the bottom of the guidelines. Because Richett's sentence for second-degree murder is not unreasonable or disproportionate, he is not entitled to resentencing.

## III. STANDARD 4 ARGUMENTS

### A. SUFFICIENCY OF THE EVIDENCE—SECOND-DEGREE MURDER

Richett argues that the prosecution failed to present sufficient evidence to overcome his self-defense claim and prove the elements of second-degree murder. We review de novo challenges to the sufficiency of the evidence. *Ericksen*, 288 Mich App at 195. In reviewing such a challenge, "this Court analyzes the evidence presented in the light most favorable to the prosecution to determine whether any rational trier of fact could have found that the essential elements of the crime charged were proven beyond a reasonable doubt." *People v Lundy*, 467 Mich 254, 257; 650 NW2d 332 (2002). Circumstantial evidence and reasonable inferences derived from the evidence can provide satisfactory proof of the elements of the crime. *People v Jackson*, 292 Mich App 583, 587; 808 NW2d 541 (2011). It is for the jury to weigh the evidence and address the credibility of the witnesses. *Id*. at 587. Therefore, any conflicts in the evidence must be resolved in the prosecution's favor. *Id*. at 587-588.

Second-degree murder requires the prosecution to prove: (1) a death, (2) caused by the defendant's act, (3) with malice, and (4) without justification or excuse.[1] *People v Goecke*, 457 Mich 442, 463-464; 579 NW2d 868 (1998). Malice requires proof that the defendant acted with

---

[1] This Court has explained that "without justification or excuse" is not an element of second-degree murder but is instead "part of the 'cluster of ideas' of second-degree murder." *People v Spears*, 346 Mich App 494, 517; 13 NW3d 20 (2023). The phrase is "simply a reiteration of the longtime understanding that a defendant cannot be guilty of second-degree murder when the homicide is justified or excused." *Id*. at 518. Because Richett claimed self-defense, it is appropriate to consider this aspect of second-degree murder here.

-13-

an intent to kill, an intent to inflict great bodily harm, "or the willful and wanton disregard for whether death will result." *People v Robinson*, 475 Mich 1, 14; 715 NW2d 44 (2006).

Richett asserts that the prosecution failed to present sufficient evidence to overcome his claim of self-defense. "[O]nce the defendant injects the issue of self-defense and satisfies the initial burden of producing some evidence from which a jury could conclude that the elements necessary to establish a prima facie defense of self-defense exist, the prosecution bears the burden of proof to exclude the possibility that the killing was done in self-defense." *People v Dupree*, 486 Mich 693, 709-710; 788 NW2d 399 (2010) (quotation marks, citation, and ellipsis omitted). The prosecution must " 'exclude the possibility' of self-defense beyond a reasonable doubt." *People v Stevens*, 306 Mich App 620, 630; 858 NW2d 98 (2014), quoting *Dupree*, 486 Mich at 709-710. "[A] defendant does not act in justifiable self-defense when he or she uses excessive force or when the defendant is the initial aggressor." *People v Guajardo*, 300 Mich App 26, 35; 832 NW2d 409 (2013).

The trial court denied Richett's request to instruct the jury on self-defense, finding that the evidence did not support the instruction. Accordingly, the trial court ruled that Richett failed to meet his initial burden to establish a claim of self-defense, and Richett has not challenged that ruling on appeal. Accordingly, the prosecution was not required to disprove self-defense. *Dupree*, 486 Mich at 709-710.

Moreover, the evidence supported the elements of second-degree murder and showed that there was no justification or excuse for Michael's death. The evidence showed that Richett struck Michael's face or head, causing him to fall to the ground. Richett also stomped or kicked Michael while he was on the ground. No evidence showed that Michael was acting aggressively or was a threat to Richett. Rather, the evidence established that Michael was attempting to break up the fight between Willingham and Thomas. Therefore, as discussed above, no evidence suggested that Richett was acting in self-defense when he struck Michael. A defendant does not act in self-defense if he uses excessive force or is the initial aggressor. *Guajardo*, 300 Mich App at 35.

Further, the evidence was sufficient to prove malice because, even if it did not establish that Richett intended to kill Michael, it was sufficient for the jury to find that he intended to cause Michael great bodily harm, or that he acted with wanton and willful disregard for whether death would result. In particular, the evidence showed that Richett kicked or stomped Michael as he lay unconscious on the ground. Accordingly, the evidence was sufficient for the jury to find that the prosecution established the elements of second-degree murder and proved that Michael's death was not justified or excused, beyond a reasonable doubt.

## B. SUFFICIENCY OF THE EVIDENCE—AWIGBH

Richett next argues that the evidence was insufficient for the jury to convict him of AWIGBH, as a lesser-included offense of assault with intent to murder. "The elements of AWIGBH are (1) an attempt or threat with force or violence to do corporal harm to another (an assault), and (2) an intent to do great bodily harm less than murder." *Stevens*, 306 Mich App at 628 (quotation marks and citation omitted). AWIGBH is a specific intent crime, requiring the intent to inflict serious injury of an aggravated nature. *Id*.

Richett again argues that the prosecution failed to establish that he did not act in self-defense. As previously discussed, the trial court rejected Richett's self-defense theory due to the lack of evidence. Therefore, the prosecution was not required to disprove self-defense. *Dupree*, 486 Mich at 709-710. In any event, the evidence showed that Richett was not at risk of harm from Thomas, and Richett's assault of Thomas was unnecessary and unprovoked. Richett chose to inject himself in the altercation between Thomas and Willingham—an altercation regarding which Willingham was the initial aggressor. No evidence indicated that Richett acted in self-defense when he attacked Thomas.

The evidence was sufficient for the jury to convict Richett of AWIGBH. Witnesses described the initial confrontation between Willingham and Thomas, starting after Thomas accidentally bumped into Willingham. Willingham then threw the first punch at Thomas. Richett then became involved and, together with Willingham, assaulted Thomas, including kicking Thomas as he was in the fetal position on the ground. The evidence therefore showed that Richett intended to cause great bodily harm to Thomas, and such intent can be inferred from his actions. *Stevens*, 306 Mich App at 628-629. Accordingly, the evidence was sufficient to support Richett's AWIGBH conviction.

## C. INEFFECTIVE ASSISTANCE OF COUNSEL—EXPERT WITNESS

Next, Richett contends that Tank rendered ineffective assistance of counsel by failing to consult an expert witness in alcohol and drug toxicology to address the effects of substance abuse on human behavior. Because Richett did not raise this issue before the trial court or in a motion to remand, our review is limited to errors apparent on the existing record. *People v Abcumby-Blair*, 335 Mich App 210, 227; 966 NW2d 437 (2020); *Heft*, 299 Mich App at 80. To support a claim premised on the failure to call an expert witness, a defendant must offer proof that the expert would have testified favorably for the defense. *People v Ackerman*, 257 Mich App 434, 455; 669 NW2d 818 (2003).

The evidence showed that both Thomas and Michael were under the influence of alcohol and cocaine at the time of the incident. At the *Ginther* hearing, Johnson explained that, when preparing for trial, he talked to experts, including Dr. Spitz, to address Michael's cause of death, raising the possibility that Michael died from a cause other than Richett's assault. However, according to Dr. Spitz, Michael's toxicology results revealed that drugs and alcohol were not a factor in causing his death. Johnson also testified that he did not pursue a defense theory involving Michael's toxicology because Richett and Lopez were unwilling to pay Dr. Spitz's fees.

Richett now argues that Tank should have investigated and procured expert testimony to explain to the jury how Thomas's and Michael's substance use affected their behavior, which could have supported Richett's self-defense theory. We find no error apparent on the existing record, which shows that neither Michael nor Thomas took any action that required Richett to defend himself from them. Whether Richett acted in lawful self-defense depended on whether he "honestly and reasonably" believed his use of force was necessary. See MCL 780.972. As previously discussed, the record fails to show that any use of force was necessary and that, instead, Richett and Willingham were the initial aggressors. In fact, Michael did not use any force at all against Richett; after Richett struck Michael once, he fell to the ground and failed to move afterward. Although an expert, theoretically, could have testified regarding how drugs and alcohol

generally affect certain behaviors, the evidence failed to establish that Michael or Thomas engaged in conduct that necessitated Richett's use of force against them. Accordingly, Richett has failed to establish prejudice as a result of Tank's failure to consult and present the testimony of a toxicology expert. *Leffew*, 508 Mich at 637.

## D. RIGHT TO TESTIFY

Richett next argues that he was denied his constitutional right to testify at trial because Tank coerced him into waiving his right to testify and provided false and inaccurate advice about the impact of testifying, including whether he might be impeached because of his prior conviction of driving while under the influence of alcohol. Because the record shows that Richett voluntarily waived his right to testify, and he has offered no support for his claim that Tank rendered ineffective assistance of counsel in this regard, his argument lacks merit.

A defendant facing criminal charges has a fundamental constitutional right to testify at trial, US Const, Am V, VI, XIV; Const 1963, art 1, §§ 17, 20, and the defendant has the ultimate decision on whether to testify. *People v Bonilla-Machado*, 489 Mich 412, 419; 803 NW2d 217 (2011). Counsel must advise the defendant of his right to testify. *Id.* If a defendant decides not to testify, the right is deemed waived. *People v Spaulding*, 332 Mich App 638, 657; 957 NW2d 843 (2020). Although there is no requirement that a defendant waive the right to testify on the record, *id.*, in this case, Richett confirmed on the record that he did not wish to testify. Where the right to testify was waived, any claimed error is extinguished by the waiver and appellate review is not available. *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000).

After the prosecution rested, Tank advised the court that he spoke at length with Richett, and the defense would not be calling any witnesses. Under oath, Richett confirmed that he did not wish to testify. Richett agreed that he met with Tank "virtually every day, at night time," during the week before trial, and he and Tank discussed whether he should testify. Richett acknowledged that he had a constitutional right to testify and that he could waive his right to testify and remain silent. Richett stated that he made the decision to waive his right to testify and denied that anyone forced or manipulated him to give up his right to testify. Therefore, the record indicates that Richett decided not to testify, and it fails to support Richett's argument that Tank, or anyone else, coerced him to give up that right. Richett's waiver of his right to testify extinguished any error. *Carter*, 462 Mich at 215. Further, there are no errors apparent on the record supporting a claim of ineffective assistance of counsel in this regard. *Abcumby-Blair*, 335 Mich App at 227; *Heft*, 299 Mich App at 80.

## E. CUMULATIVE ERROR

Richett contends that, even if no single error alone supports granting a new trial, the cumulative effect of his numerous claims of error warrants a new trial. Although a single error in a trial may not necessarily provide a basis for granting a new trial, it is possible that the cumulative effect of multiple minor errors may add up to error requiring reversal. *People v Lowrey*, 342 Mich App 99, 119; 993 NW2d 62 (2022). The test is whether the cumulative effect of multiple errors deprived the defendant of a fair and impartial trial. *People v Taylor*, 185 Mich App 1, 10; 460 NW2d 582 (1990). Each of the errors must be of some consequence, and the cumulative effect must undermine confidence in the reliability of the verdict. *Lowrey*, 342 Mich App at 119.

Because Richett has failed to establish that any error occurred, there is no cumulative effect of multiple errors requiring a new trial.

## F. RESTITUTION

Finally, Richett argues that the trial court erred by ordering him to pay restitution when the prosecution failed to provide support for the amount of restitution imposed. He alternatively argues that Tank was ineffective for failing to object to the imposition of restitution. We conclude that Richett's arguments lack merit.

The Victim's Impact Statement in the Presentence Investigation Report (PSIR) indicated that Michael's son paid Michael's funeral expenses, and a receipt would be provided to the trial court for purposes of ordering restitution. The PSIR also indicated that Thomas was in counseling, and the family hoped that Michael's two youngest children would also participate in counseling. At sentencing, the trial court initially stated that restitution would be determined at some point in the future but, thereafter, the following exchange occurred:

> [*The prosecutor*:] Your Honor, uhm, with respect to restitution, we had some discussions in chambers, with, with respect to a claim made by Thomas Beaudrie.
>
> But, uhm, I did also, uh, have documentation with respect to a paid funeral expense, for Michael Beaudrie.
>
> I have the form filled out.
>
> I also have documentation from the funeral home, for an amount of seven thousand three hundred thirty-one dollars and seventy cents, which was paid by, uhm, Michael Beaudrie's son.
>
> And I would ask the Court to, uh, consider granting that restitution, at this time.
>
> *The Court*: Mr. Tank?
>
> *Mr. Tank*: No objection.
>
> *The Court*: All right.
>
> The, the Court will just modify what I earlier said, regarding restitution.
>
> The sentence will include your obligation to pay funeral expenses in the amount of seven thousand three hundred and thirty-one dollars and seventy cents, and any other expenses are to be determined.

Richett's judgment of sentence imposed restitution in the amount of $7,331.70 "to pay funeral expenses."

Richett argues that the trial court erred by ordering him to pay restitution in the amount of $7,331.70 because no evidence established the amount of funeral expenses or whether insurance reimbursed Michael's family for the expenses. Contrary to Richett's argument, the prosecutor stated at sentencing that she had documentation evidencing that Michael's son paid $7,331.70 for Michael's funeral. MCL 780.766(4)(f) and MCL 769.1a(5) specifically allow a trial court to grant restitution to cover actual funeral expenses. Richett's claim that insurance may have covered some or all of Michael's funeral expenses is purely speculative, and the record fails altogether to support that claim.

Richett also asserts that the trial court erred by leaving open the possibility that it could order additional restitution in the future. Richett's judgment of sentence states, "[A]ny other restitution costs are to be determined." We note that the record does not indicate that additional restitution has been imposed. In any event, MCL 780.766(22) and MCR 6.430(A) allow a trial court to amend an order of restitution.

In addition, Richett argues that Tank rendered ineffective assistance of counsel by agreeing to the amount of restitution without first investigating to determine whether Michael's family received insurance proceeds to pay Michael's funeral expenses. As previously stated, however, Richett's claim that Michael's family may have received insurance proceeds to cover the cost of Michael's funeral is purely speculative. On the existing record, Richett has not shown that Tank should have done more regarding the amount of restitution or that Richett was prejudiced as a result of Tank's actions. *Leffew*, 508 Mich at 637.

Affirmed.

/s/ Randy J. Wallace
/s/ Kristina Robinson Garrett
/s/ Matthew S. Ackerman